No. 2016-2731

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ROBERT BOSCH HEALTHCARE SYSTEMS, INC.,

*Appellant,*

*v.*

CARDIOCOM, LLC, MEDTRONIC, INC.,

*Appellees.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in *Inter Partes* Reexamination Control No. 95/002,199

## BRIEF FOR APPELLEES CARDIOCOM, LLC AND MEDTRONIC, INC.

DANIEL W. MCDONALD
MERCHANT & GOULD P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 332-5300

MARK C. FLEMING
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

*Attorneys for Appellees Cardiocom, LLC and Medtronic, Inc.*

February 21, 2017

# CERTIFICATE OF INTEREST

Counsel for Appellees Cardiocom, LLC and Medtronic, Inc. certifies the following:

1.     The full name of every party or *amicus* represented by us is:

Cardiocom, LLC and Medtronic, Inc.

2.     The names of the real party in interest represented by us is:

Not applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Medtronic plc wholly owns and is the ultimate parent of Medtronic, Inc. Medtronic plc is a publicly traded corporation.  No other publicly traded corporation owns 10% or more of the stock of Medtronic plc.

Medtronic, Inc. wholly owns and controls Cardiocom, LLC, whose name was changed Medtronic Care Management Service, LLC.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Brittany Blueitt Amadi, Mark C. Fleming

MERCHANT & GOULD P.C.:  Andrew J. Lagatta, George C. Lewis, Daniel W. McDonald, Nisha N. Patel

Dated:  February 21, 2017

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF RELATED CASES ....................................................1

INTRODUCTION ..................................................................................1

STATEMENT OF ISSUE ON APPEAL................................................3

STATEMENT OF FACTS .....................................................................3

    A.    The Parties ................................................................3

    B.    The Prior Art ............................................................4

        1.    Kirk ....................................................................4

        2.    Gombrich ..........................................................7

        3.    Clough................................................................9

    C.    Bosch's '327 Patent................................................11

    D.    Proceedings Before The Examiner..........................14

    E.    Proceedings Before The Board ...............................18

SUMMARY OF THE ARGUMENT .....................................................21

STANDARD OF REVIEW ...................................................................23

ARGUMENT ........................................................................................24

I.    THE BOARD CORRECTLY DETERMINED THAT CLAIMS 1-85 OF THE '327 PATENT ARE OBVIOUS OVER KIRK IN VIEW OF GOMBRICH AND CLOUGH. ...............................................................24

A.      The Board Correctly Determined That There Was A Motivation To Combine Kirk With Clough To Satisfy The "Computer Programs" Claim Limitations. ...................................24

      1.      The Board's determination that there was a motivation to combine Kirk with Clough is not a new ground of rejection. ...........................................25

      2.      The Board's determination that there was a motivation to combine Kirk with Clough is supported by substantial evidence. ...........................................29

B.      The Board Correctly Determined That Gombrich Teaches An "Authorized-User Computer." ........................................32

      1.      The Board's determination that Gombrich teaches an "authorized-user computer" is not a new ground of rejection. ...............................................................33

      2.      The Board's determination that Gombrich teaches an authorized user computer is supported by substantial evidence. ...............................................................36

II.      THE BOARD CORRECTLY DETERMINED THAT CLAIMS 13 AND 51 OF THE '327 PATENT ARE OBVIOUS OVER KIRK IN VIEW OF GOMBRICH AND CLOUGH. ...............................................................41

      A.      The Board Correctly Construed The Term "User" In Accordance With Its Broadest Reasonable Interpretation. ................41

      B.      The Board's Determination That Gombrich Discloses The Claimed "User" Is Supported By Substantial Evidence. ...........................................43

CONCLUSION ......................................................................45

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ad Hoc Shrimp Trade Action Committee v. United States*,
618 F.3d 1316 (Fed. Cir. 2010) ........................................................23

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ........................................................37

*EWP Corp. v. Reliance Universal Inc.*,
755 F.2d 898 (Fed. Cir. 1985) ..........................................................37

*Fleshman v. West*,
138 F.3d 1429 (Fed. Cir. 1998) ........................................................44

*In re Adler*,
723 F.3d 1322 (Fed. Cir. 2013) ................................................25, 34

*In re CSB-System International, Inc.*,
832 F.3d 1335 (Fed. Cir. 2016) ........................................................23

*In re Jung*,
637 F.3d 1356 (Fed. Cir. 2011) ........................................................34

*In re Kronig*,
539 F.2d 1300 (C.C.P.A. 1976) ........................................................34

*In re NuVasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ..........................................................27

*In re Rambus, Inc.*,
753 F.3d 1253 (Fed. Cir. 2014) ........................................................24

*In re Skvorecz*,
580 F.3d 1262 (Fed. Cir. 2009) ........................................................42

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ........................................................44

*KSR International Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ..........................................................................31

*Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States*,
 377 U.S. 235 (1964) ................................................................44

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
 134 S. Ct. 2120 (2014) ...........................................................42

*Rambus Inc. v. Rea*,
 731 F.3d 1248 (Fed. Cir. 2013) ...............................................23

*Securities & Exchange Commission v. Chenery Corp.*,
 318 U.S. 80 (1943) .................................................................44

*Tempo Lighting, Inc. v. Tivoli, LLC*,
 742 F.3d 973 (Fed. Cir. 2014) ................................................45

## DOCKETED CASES

*Robert Bosch Healthcare Systems, Inc. v. Cardiocom, LLC*,
 No. 5:12-cv-03864-EJD (N.D. Cal.) ...........................................3

## STATUTES

35 U.S.C. § 103(a) ......................................................................23

## OTHER AUTHORITIES

*Manual of Patent Examining Procedure* (8th ed. 2008) ...........................42

## STATEMENT OF RELATED CASES

No other appeal from this *inter partes* reexamination was previously before this or any other appellate court.

The Court's decision in this case may affect or be affected by the following related case: *Robert Bosch Healthcare Systems, Inc. v. Cardiocom, LLC*, 5:12-cv-03864 (N.D. Cal.). That case was stayed on December 3, 2012 pending exhaustion of several reexamination proceedings, including the reexamination proceeding at issue in this appeal.

The patent at issue in this appeal, U.S. Patent No. 7,941,327 ("the '327 patent"), was also the subject of a separate *ex parte* reexamination proceeding, Control No. 90/013,271. In that proceeding, the Examiner issued a final rejection of claims 1, 2, 7, and 52-54 for nonstatutory double patenting.

Counsel for Appellees Cardiocom, LLC ("Cardiocom") and Medtronic, Inc. ("Medtronic") know of no other case pending in this or any other court that may affect or be affected by the Court's decision in this appeal.

## INTRODUCTION

The Board correctly concluded that Bosch's '327 patent did not claim anything that was not entirely obvious over the prior art. Bosch's '327 patent recites a remote healthcare monitoring system comprised of three components that were well-known in the art: "a remote user-monitoring subsystem" to monitor a

- 1 -

patient; an "authorized-user computer" to allow a healthcare professional to monitor the patient remotely; and a "central server" that allows the first two components to communicate with each other.  After an Examiner set forth no fewer than twenty grounds of rejection, the Board resolved the case by upholding one ground that disposed of every claim of the '327 patent:  namely, that they were rendered obvious by the combination of three prior art references—Kirk, Gombrich, and Clough.

On appeal, Bosch does not dispute that these three basic components were disclosed in the prior art.  Instead, Bosch wrongly accuses the Board of supporting its rejections on different grounds from those adopted by the Examiner and failing to fully consider the teachings of the prior art references with respect to minor limitations in the claims.

Bosch's argument regarding "new grounds" lacks merit.  The Board considered—and correctly rejected—each of the arguments that Bosch raises on appeal, finding the claims obvious on the same basic grounds as the Examiner. And there is no question that Bosch had a full and fair opportunity to (and in fact did) respond to the bases for those rejections.  There was thus no procedural error in the Board's decision.  Moreover, the Board's conclusions that the prior art references taught particular claim limitations and that it would have been obvious

to an ordinarily skilled artisan to combine them to produce the claims of the '327 patent are well supported by the record.

Bosch has shown no error in the Board's decision, and it should be affirmed in full.

## STATEMENT OF ISSUE ON APPEAL

Whether the Board's determination that claims 1-85 of the '327 patent are unpatentable is supported by substantial evidence.

## STATEMENT OF FACTS

### A.    The Parties

Medtronic is one of the world's leading healthcare and medical device companies.  Cardiocom, a wholly owned subsidiary of Medtronic, is a healthcare company that manufactures and sells a variety of remote patient monitoring products, software, and services.

On July 24, 2012, rival healthcare company Robert Bosch Healthcare Systems, Inc. ("Bosch") sued Cardiocom in the Northern District of California for patent infringement.  *See* Compl., *Robert Bosch Healthcare Sys., Inc. v. Cardiocom, LLC*, No. 5:12-cv-03864-EJD (N.D. Cal. Jul. 24, 2012).  Bosch alleged that Cardiocom's making and selling of a remote health monitoring device infringed a number of Bosch's patents, including the '327 patent.  *Id.* ¶¶ 12-13, 23-25.  Two months later, on September 12, 2012, Cardiocom filed the request for

*inter partes* reexamination of the '327 patent that is the subject of this appeal.  *See* Appx201-204; Appx724.[1]

### B.    The Prior Art

As explained in the background section of the '327 patent, electronic self-care monitoring systems have long been available to allow for remote monitoring of chronic health conditions.  Appx61(1:48-57).  Such systems provide a cost-effective means for healthcare professionals and care providers to review patient data collected remotely in order to assess the patient's progress, as well as any need to adjust the patient's treatment plan.  Appx61(2:1-55); *see also* Appx61(1:40-47).  The prior art references at issue in this appeal are just a few examples of such systems available in a very crowded field at the time of the alleged invention claimed in Bosch's '327 patent.

### 1.    Kirk

U.S. Patent No. 5,390,238 ("Kirk"), entitled "Health Support System," was filed on June 15, 1992, and issued on February 14, 1995.  Appx192.  Bosch does not dispute that Kirk is prior art to the '327 patent.  The Kirk inventors recognized the need in the healthcare industry for "a practical, economical method and apparatus for home health care" that could provide "a 24 hour per day medication

---

[1]    Following Medtronic's acquisition of Cardiocom, on December 30, 2013, Medtronic was added as a real party in interest to the reexamination proceedings. Appx1501.

reminder," "verification of medication and delivery," and "remote data accumulation and reporting," among other services.  Appx197(1:40-49).  To satisfy that need, Kirk disclosed a healthcare support system for "monitoring and supporting a patient."  Appx197(1:61-64).  The Kirk healthcare support system included "a health support unit" for monitoring patient data and communicating information to the patient.  *See* Appx197(2:1-15).  Kirk's health support unit included an "external communications interface" for "allowing access to patient data and for accepting external data from an external source."  Appx197(2:13-15).

In addition to the health support unit, the Kirk system also included a remote "monitoring terminal" that allowed the healthcare provider to receive reports on the patient's condition from the health support unit.  Appx199(5:59-62).  The monitoring terminal (44) is connected to the health support unit (30) through "a network server" (38) that provides "for exchanging information between the … health support unit and the … monitoring terminal" (Appx197(1:61-68)), as depicted in Figure 3 of Kirk reproduced below.



FIG. 3

Appx194(Fig. 3).  Thus, the system disclosed in Kirk included three primary

components:  (1) a health support unit at the patient's location to provide

interactive patient monitoring services; (2) a monitoring terminal to allow the

healthcare provider to monitor the progress of the patient from a remote location;

and (3) a network server to allow the first two components to communicate and

transfer information.

### 2.     Gombrich

U.S. Patent No. 4,835,372 ("Gombrich"), entitled "Patient Care System,"
was filed on July 24, 1987, and issued on May 30, 1989.  Appx101.  Bosch does
not dispute that Gombrich is prior art to the '327 patent.  Gombrich discloses "a
system for patient identification comprising a programmed general purpose
computer means for processing and storing patient data."  Appx130(2:3-6).  The
system described in Gombrich includes a plurality of remote terminals having "bar
code reader[s]."  Appx130(2:16-19, 26-30); Appx134(9:67-10:5).  The bar code
reader includes a "wand device" (120) for scanning bar codes, as illustrated in
Figure 11 of Gombrich reproduced below.



Appx109(Fig. 11); Appx135(12:30-34); *see also* Appx133(7:19-21); Appx130(2:2-
19) ("The present invention relates to a system for patient identification comprising
a programmed general purpose computer means for processing and storing patient

data.  Input devices are operatively interconnected with the computer means for input of patient data into the computer. …  The input means includes a portable terminal having a bar code reader for scanning the [bar] code.").

Portable bar code readers as shown in Figure 11 can be used to scan bar codes on location in a patient's room and at other remote locations, as "there might be many other ones of the bar code reading devices 48 located throughout the hospital, and indeed, each nurse and/or patient's bed might have one of the bar code reading devices 48.  Moreover, nonportable bar code reading devices might be used in some areas of the hospital where portability is not necessary or desirable," such as at remote workstations operated by the healthcare provider. Appx134(9:64-10:5); *see* Appx135(12:40-43) ("The remote terminals 45 might also be interconnected to a similar wand device 123 for reading bar codes at the terminals."); Appx103(Fig. 1) (depicting both terminal 45 and portable bar code reader 48 as including a bar code wand); *see also* Appx134(9:34-38) ("The terminals 45 … might be located locally and at remote locations, as required; for example, in the pharmacy, in the laboratory, in the supply room, in X-ray, in radiology, in the billing department, at the nurses' stations, etc.").

Gombrich also teaches that the disclosed bar code reader and wand are used to "provide for limited access to the system and provide for identification of the person and/or department entering data respecting a patient and/or items."

- 8 -

Appx130(2:50-54). For example, "[w]hen ready to administer treatment, a nurse will take the portable RF bar code reading device 48 and read her own identifying bar code badge to access the system and to identify herself." Appx137(16:18-21); *see also* Appx143(27:20-26) ("The liquid crystal display will display to the user an indication to scan their ID badge. After a valid scan of their ID badge, the portable handheld patient terminal will be in the main menu for function selection. Access to the system has now been gained."); Appx149(39:39-43) ("The user is also requested to enter his/her barcode ID. The computer system will compare the barcode ID and the staff ID. This provides a double verification of the user's authority to access the system."). Thus, the bar code reader described in Gombrich may be used to allow authorized users to access the system.

### 3.     Clough

U.S. Patent No. 5,379,057 ("Clough"), entitled "Portable Computer with Touch Screen and Computer System Employing Same," was filed on July 28, 1993 as a continuation of applications dating back to November 1988, and issued on January 3, 1995. Appx153. Bosch does not dispute that Clough is prior art to the '327 patent. Clough discloses "an improved portable computer" that is "specifically adapted for facilitated data collection and recordation." Appx173(2:44-47). The system described in Clough provides for collection of information from users, and thus offers "particular advantages" in "medical

diagnostic applications." Appx174(3:14-19). The Clough system includes an embodiment with two primary components—a "host computer" and a number of portable or "satellite" computers. *See, e.g.*, Appx158(Fig. 4B).

The host computer may include an "application generator" that allows a designer to "design application screen contents and formats for data collection." Appx176(7:25-33); *see also* Appx174(4:21-24) ("FIG. 5 is a block diagram of an application generator in accordance with the invention, by which the host computer of FIG. 4A generates applications for data collection."). After an application is designed by the application generator, it can be downloaded to one or more satellite computers. Appx176(7:43-45). The host computer may store "[a] whole series of applications and associated libraries …, any of which being available to be downloaded to one of the [portable] computers." Appx176(7:28-33, 46-53); *see also* Appx158(Fig. 4B).

Clough teaches that the portable or "satellite" computers execute applications received from the "host computer." Appx174(3:58-65); *see also* Appx176(7:9-13) ("[T]he application is down-loaded from the host computer 12 to, the satellite computers 10A-10N, and then, is run in the satellite computers 10A-10N typically after communication with the host computer 202 has ended."); Appx176(7:43-45) ("Once an application is designed by the host system 202, it is then downloaded to one or more of the satellite computers 10A-10N.").

Clough further teaches that "[t]he uploading or downloading between the host computer 202 and the satellite computers 10A-10N can be performed in any of several ways--by user-transportable means such as a floppy disk, a cable attachable from the host computer 202 to the satellite computers 10A-10N whenever communication is to occur, or a temporary modem connection, or other communication means." Appx176(8:1-8).

### C.   Bosch's '327 Patent

Bosch's '327 patent at issue in this appeal is entitled "User Monitoring." Appx49. It was filed on December 3, 2004 and issued on May 10, 2011. *Id.* Like the system disclosed in Kirk, the '327 patent discloses a healthcare monitoring system made up of at least one of the following three components: "a remote user-monitoring subsystem" (*i.e.*, a patient monitoring system (58)), an "authorized-user computer" remotely located at the healthcare professional (62), and "a central server" (54) (Appx49(abstract)), as depicted in Figure 2 of the '327 patent reproduced below:



Fig. 2.

Appx56(Fig. 2).

The user-monitoring subsystem includes a data management unit connected to various devices to monitor the health condition of the patient. Appx64(8:25-29, 38-45); *see also* Appx55(Fig. 1). The monitoring system also allows for communication of collected patient information and data to a "clearinghouse," which "can be considered to be a central server." Appx66(11:55-62, 12:47-50).

The central server or clearinghouse "receives data"—such as test results and other patient information—"from a plurality of self-care microprocessor-based healthcare systems." Appx66(12:30-39); *see also* Appx56(Fig. 2). The clearinghouse "facilitates communication between a user of the system … and his

or her healthcare professional and can provide additional services such as updating system software." Appx66(11:62-66).

Remotely located healthcare professionals can retrieve patient data submitted to the clearinghouse through a remote computer. Appx67(13:24-34). In particular, the system allows healthcare professionals to access patient information by "transmit[ting] an authorization code to clearinghouse 54 that identifies the healthcare professional as an authorized user of the clearinghouse." Appx67(13:9-14). Healthcare professionals can also use the remote computer to "send messages and/or instructions to each patient" through the clearinghouse. Appx67(13:44-46).

Claim 1 of the '327 patent is representative and recites the three components of the described healthcare monitoring system:

1.    A user-based monitoring system, comprising:

(a)    at least one remote user-monitoring subsystem configured to facilitate collection of user-related physiological data and including at least one monitoring unit, said remote user-monitoring subsystem comprises a microprocessor-based unit *configured to receive a computer program*, wherein said computer program, when executed, collects said user-related physiological data;

(b)    at least one central server remotely located from the remote user-monitoring subsystem and configured for communication with the remote user-monitoring subsystem to (i) receive signal communications therefrom and (ii) *send said computer program* to said remote user-monitoring subsystem; and

(c)    at least one ***authorized-user computer*** remotely located from, and configured for two-way signal communication with, the central server to allow an authorized-user to communicate with the central server upon transmitting an identifying authorization code and receive reports, based on said user-related physiological data collected by said remote user-monitoring subsystem, from the central server, wherein the reports include at least information on the current condition of a remote user being monitored.

Appx71(21:36-60) (emphases added).  As relevant here, dependent claims 13 and 51 add the requirement that "the system is configured to enable ***the user*** to respond to information on the display by using a cursor or other indicator positioned at a selected item."  Appx71(22:27-30) (emphasis added); Appx72(24:47-50) (emphasis added).

## D.    Proceedings Before The Examiner

Cardiocom requested *inter partes* reexamination of claims 1-85 of Bosch's '327 patent.  Appx201.  In its request, Cardiocom identified several grounds of invalidity, including that all claims are rendered obvious by Kirk in view of Gombrich and in further view of Clough.  Appx203-204.  In particular, with respect to the claim requirement that a "computer program" be transmitted from the central server to the user-monitoring subsystem, Cardiocom explained:

Kirk teaches "a network server coupled between the at least one health support unit and the at least one monitoring terminal for exchanging information between the at least one health support unit and the at least one monitoring terminal."  Further, one of ordinary skill in the art would recognize that Kirk's teaching of information exchange between the health support unit and the monitoring terminal

> creates a ***design need or incentive*** to seek out suitable techniques,
> ***such as the computer programs of Clough*** or Wahlquist to carry out
> this functionality.  This design need or incentive would furnish a
> reason to one of ordinary skill in the art to combine Kirk, in view of
> Gombrich, with any of Clough or Wahlquist.

Appx233 (emphases added) (citations omitted).  Cardiocom also explained that

Gombrich disclosed allowing an authorized user to communicate with the central

server after identifying an authorization code, because the bar code reader

described in Gombrich was used to gain access to the system.  Appx468.

Cardiocom also offered the expert declaration of Dr. Robert T. Stone, an expert in

the field of medical device design.  Appx928-934.  Among other things, Dr. Stone

explained that a skilled artisan would have been motivated to combine Kirk with

Gombrich and Clough, explaining:

> The trend in the industry was towards increasing modem speeds and
> downloadable programs, which increased distribution and update
> speed, and reduced the cost of distribution.  One of ordinary skill
> would readily appreciate that the downloadable programs of either
> Clough or Wahlquist could be used with the hardware systems of Kirk
> and Gombrich to carry out remote health monitoring functions.

Appx933(¶24).[2]

---

[2]    Dr. Stone also explained that the level of ordinary skill in the art at the time
of the alleged invention would have been a person with "a bachelor's degree in
Electrical Engineering or Computer Science, or its equivalent, and at least 2 years
of experience with the design and programming of patient monitoring systems and
at least 1 year of experience with the design or programming of networked
systems."  Appx929(¶10).  Bosch offered no competing declaration or evidence
regarding the level of ordinary skill; Dr. Stone's testimony on this point is
unrebutted.

After receiving Cardiocom's reexamination request, the Examiner instituted reexamination on all claims of the '327 patent on December 10, 2012. Appx725; Appx727. Although Bosch responded to the reexamination request on February 11, 2013 (Appx799), Bosch did not offer any competing expert declaration regarding the patentability of the '327 patent claims. After considering the parties' various submissions, including Dr. Stone's declaration, the Examiner issued a final rejection of claims 1-85 on twenty grounds. Appx946-1066. Among those grounds was the Examiner's rejection of claims 1-85 as obvious over Kirk in view of Gombrich and Clough. *See* Appx987-992; *see also* Appx1036-1046. In issuing that rejection, the Examiner considered and rejected each of Bosch's arguments in support of patentability.

Among the arguments considered by the Examiner was Bosch's argument that a skilled artisan would not have been motivated to combine Kirk with Clough to satisfy the claim requirement that the remote user-monitoring subsystem be "configured to receive a computer program" from the central server. Appx988-991. The Examiner rejected Bosch's argument that "the need for information exchange between a health support unit and a monitoring terminal" described in Kirk did not create a design need for the "programs of Clough." Appx988-989. The Examiner explained that "one of ordinary skill in the art would recognize that Kirk's teaching of information exchange between the health support unit and the

monitoring terminal creates a design need or incentive to seek out suitable
techniques, such as the computer programs of Clough to carry out this
functionality." Appx1040.

The Examiner also considered (and rejected) Bosch's claim that Gombrich
fails to disclose an "authorized-user computer … configured … to allow an
authorized user to communicate with the central server upon transmitting an
identifying authorization code." Appx987-988. The Examiner explained that
"Gombrich teaches that it was well known in the art to require the transmission of
an authorization code." Appx988. The Examiner further noted that Gombrich
taught allowing "an authorized-user to communicate with the central server upon
transmitting an identifying authorization code" (*i.e.*, scanning a bar code).
Appx1039.

Following the final rejection, the Examiner issued a Right of Appeal Notice.
Appx1069. The 100-page Right of Appeal Notice likewise adopted twenty
separate grounds for rejection. *See* Appx1070-Appx1168. With respect to the
Examiner's rejection of the claims as unpatentable over the combination of Kirk,
Gombrich, and Clough (Issue 15), the Examiner further reiterated his earlier
finding that the exchange of information disclosed in Kirk created a design need
for the "computer programs" described in Clough. *See* Appx1106. In addition,
addressing Bosch's argument that "the RF bar code reading device 48 [described in

Gombrich] and the terminal 45 are not even located in the same place"
(Appx1090), the Examiner explained that, in addition to the "specific example" of
a nurse scanning an identification badge to gain access to the system, Gombrich
disclosed "that the bar code reading devices could be used for a variety of other
security-related tasks" (Appx1091). The Examiner thus determined that "the
authorized computer read[s] on the health care professional computer 45/258 of
Gombrich *which has a RF bar code reading device* which allows the nurse to
identify themselves and to communicate to the computer system 42." Appx1105
(emphasis added); *see also* Appx103(Fig. 1) (depicting bar code reading devices
located at both terminal 45 and portable bar code reader 48).

### E.    Proceedings Before The Board

Bosch appealed all twenty of the Examiner's final rejections to the Board,
including the Examiner's rejection of claims 1-85 as obvious over Kirk in view of
Gombrich and Clough. Appx1169; Appx1176-1178 (Issue O). With respect to the
Kirk/Gombrich/Clough combination, Bosch contended that the Examiner (1) failed
to set forth a legally sufficient basis for combining Kirk and Gombrich
(Appx1196-1197); (2) should not have found that the combination of Kirk,
Gombrich, and Clough disclosed an "authorized user computer" (Appx1198); and
(3) with respect to claims 13 and 51, should not have determined that Gombrich

disclosed a system that enabled the user to respond to information on the display (Appx1198-1199).

The Board issued its Decision on Appeal on May 29, 2015.  Appx1-12.  The Board acknowledged all twenty grounds for rejection sustained by the Examiner, but focused its analysis on the Examiner's finding that claims 1-85 of the '327 patent were obvious over Kirk in view of Gombrich and in further view of Clough. *See* Appx4-7.  With respect to the combination of Kirk and Clough, the Board agreed with the Examiner, explaining:

> ***We agree with the Examiner's stated rationale*** that Kirk's information exchange between the health support unit 30 and the monitoring terminals 44 (Fig. 3) creates a design need or incentive for one of ordinary skill in the art to seek out suitable techniques, such as the distribution of program updates to remote devices mentioned in Clough, to perform these functions.  ***It does not matter that Clough does not exclusively prefer the transmission of programs over any other method of program transfer; all that is required is that Clough merely discloses such downloading to remote computers***.

Appx8 (emphases added) (citations omitted).

The Board also rejected Bosch's claim that the prior art failed to disclose an "authorized-user computer."  Appx9.  The Board explained that "Gombrich discloses that bar codes may be used for user access authentication" and that "terminal 45 is equipped with bar code wand 123," such that "an authorized user located at, for example, a nurses' station, may authenticate his or her use of the

authorized-user computer (terminal 45) using bar code reader 123, just as a nurse working in a patient's room may do." Appx9-10 (citations omitted).

Finally, the Board concluded that there was no error in the Examiner's findings with respect to claims 13 and 51. Appx10-11. The Board explained that the "broadest reasonable interpretation of 'user' in claims 13 and 51" includes "either a patient (a remote user being monitored) or a health care professional (an authorized user who communicates with the central server)." Appx10. The Board then found that Gombrich discloses enabling a user "to respond to information on the display." Appx11. Accordingly, the Board affirmed the Examiner's rejection of claims 1-85 of the '327 patent as obvious over Kirk in view of Gombrich and in further view of Clough. Appx12.

Bosch petitioned for rehearing, asserting that the Board allegedly misapprehended or overlooked two facts in rendering its decision. Appx1301-1310. First, Bosch contended that the Board's determination that "Gombrich discloses that the bar code wand 123 is used to scan a nurse's identification to allow the nurse to access records on the nurse station terminal 45" constituted a new ground of rejection not previously raised by the Examiner. Appx1303. Second, Bosch asserted that the Board erred in its construction of the term "user" in claims 13 and 51, because the term was supposedly limited to "the remote user being monitored, and not the 'authorized-user.'" Appx1306.

The Board rejected both of the arguments in Bosch's request for rehearing. Appx15-18.  With respect to the "authorized user computer" limitation, the Board ruled that its rationale was not a new ground of rejection, explaining that "[t]he evidence relied upon in affirming the Examiner's rejection is the same, and the basic thrust of the rejection is the same."  Appx16.  With respect to claims 13 and 51, the Board maintained its finding that "the broadest reasonable interpretation of 'user' may refer to either a patient (i.e., a remote user being monitored) or a health care professional (i.e., an authorized user who communicates with the central server)."  Appx17-18.  The Board thus denied rehearing.  Appx18.

## SUMMARY OF THE ARGUMENT

The Board correctly determined that all claims of the '327 patent are obvious over Kirk in view of Gombrich and Clough, and that finding is supported by substantial evidence.  Bosch's various challenges to the Board's decision lack merit and should be rejected.

1.    Bosch first contests the Board's finding that a skilled artisan would have been motivated to combine the teachings of Kirk with the techniques described in Clough.  According to Bosch, the Board affirmed the rejection on a basis not raised by the Examiner.  But the Board's findings did not deviate from those of the Examiner, to which Bosch had a full and fair opportunity to respond; the Board's use of slightly different words does not change the substance of the

rejection.  Moreover, there is no question that Clough discloses the distribution of

"computer programs," as required by the claims, and the Board's determination

that a skilled artisan would have been motivated to combine Kirk with Clough is

more than supported by substantial evidence.

2.  With respect to the "authorized-user computer" limitations, Bosch

again claims that the Board deviated from the rationale articulated by the

Examiner.  Again, however, the Board's finding that Gombrich discloses the

"authorized-user computer" limitations mirrors the Examiner's reasoning.

Gombrich expressly teaches use of bar code readers that allow an authorized user

to access the system through an authorized-user computer.  Thus, the Board's

finding that the "authorized-user computer" limitations were fully disclosed in the

prior art is supported by substantial evidence and was not a new ground of

rejection.

3.  Finally, Bosch contends that the Board erred by construing the term

"user" in dependent claims 13 and 51 to include both patient and healthcare

professional users of the system.  Contrary to Bosch's contentions, however, the

Board correctly gave the term "user" its broadest reasonable interpretation.

Bosch's effort to constrict the meaning of the broad word "user" is unsupported by

the claims or the specification.  Under that correct construction, the Board properly

found that the limitations of claims 13 and 51 were disclosed in Gombrich (a finding that Bosch does not dispute on appeal).

Bosch has failed to identify any infirmity in the Board's decision. Accordingly, the Board's decision should be affirmed in full.

## STANDARD OF REVIEW

This Court reviews "the Board's factual findings for substantial evidence and its legal conclusions *de novo*." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013). "Substantial evidence is more than a mere scintilla and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1321 (Fed. Cir. 2010). "Whether a claim would have been obvious under 35 U.S.C. § 103(a) is a legal conclusion based on underlying factual determinations," including "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness." *Rambus*, 731 F.3d at 1251-1252.

This Court reviews the Board's ultimate claim construction in a reexamination de novo, and "any determinations involving extrinsic evidence for substantial evidence." *In re CSB-System Int'l, Inc.*, 832 F.3d 1335, 1340 (Fed. Cir. 2016). During a reexamination, the Board construes the claims in accordance with

their "'broadest reasonable interpretation' consistent with the specification." *In re Rambus, Inc.*, 753 F.3d 1253, 1255 (Fed. Cir. 2014).

## ARGUMENT

### I. THE BOARD CORRECTLY DETERMINED THAT CLAIMS 1-85 OF THE '327 PATENT ARE OBVIOUS OVER KIRK IN VIEW OF GOMBRICH AND CLOUGH.

#### A. The Board Correctly Determined That There Was A Motivation To Combine Kirk With Clough To Satisfy The "Computer Programs" Claim Limitations.

Each claim of the '327 patent requires a remote user-monitoring subsystem that is "configured to receive a computer program" sent by a central server. *See, e.g.*, Appx71(21:38-50). Because the Examiner found that Kirk does not disclose that limitation, the Examiner looked to Clough to fill that gap, finding that the teachings of Kirk created a design need satisfied by the techniques disclosed in Clough. *See, e.g.*, Appx1037; Appx1040. The Board agreed. Appx8.

Bosch does not dispute that the healthcare monitoring system of Kirk teaches the vast majority of the limitations claimed in the '327 patent or that Clough teaches that it has particular application to "medical diagnostic applications" (Appx174(3:14-19)). Instead, Bosch challenges the Board's factual finding that the information exchange disclosed in Kirk created a design need for the techniques of Clough. Br. 28-33. Contrary to Bosch's argument, the Board's stated rationale for combining Kirk with Clough was not a new ground of rejection; it was the same basic rationale articulated by the Examiner and advanced

by Cardiocom throughout the proceedings.  Moreover, the Board's finding that a

skilled artisan would have been motivated to combine Kirk with Clough as claimed

is more than supported by substantial evidence.

> ### 1.    The Board's determination that there was a motivation to combine Kirk with Clough is not a new ground of rejection.

Bosch criticizes the Board for purportedly relying on a rationale for

combining the references—"distribution of program updates"—not articulated by

the Examiner (Br. 30), claiming that it "has not had the opportunity to respond to

the new grounds" (Br. 33).  Bosch's principal complaint appears to lie with the

Board's use of the phrase "program updates" in place of the Examiner's phrase

"computer programs."  Br. 30 ("[T]he Examiner has not asserted that 'distribution

of program updates to remote devices' satisfies the alleged design needs of Kirk,

but rather that the 'computer programs of Clough' satisfy the alleged design

needs.").  But the distinction that Bosch seeks to draw between the Examiner's

rationale and the Board's rationale does not exist.  As the Board explained on

rehearing, "[i]t is not a new ground of rejection for the Board to respond to the

Patent Owner's arguments using different language, or restating the reasoning of

the rejection in a different way."  Appx15.

Rather, "[t]he ultimate criterion of whether a rejection is considered 'new' in

a decision by the [B]oard is whether [applicants] have had fair opportunity to react

to the thrust of the rejection."  *In re Adler*, 723 F.3d 1322, 1327 (Fed. Cir. 2013)

(internal quotation marks omitted) (second and third alterations in original).  That is certainly the case here.  In the final rejection, the Examiner explained:

> [O]ne of ordinary skill in the art would recognize that Kirk's teaching of information exchange between the health support unit and the monitoring terminal creates a ***design need or incentive*** to seek out suitable techniques, such as the computer programs of Clough to carry out this functionality.  This design need or incentive would furnish a reason to one of ordinary skill in the art to combine Kirk, in view of Gombrich, with Clough.

Appx1040 (emphasis added); *see also* Appx1106 (Right of Appeal Notice).  The Examiner further rejected Bosch's argument that there was no "suitable reason for modifying Kirk to 'receiv[e] a computer program' from a remote server" (Appx988), explaining that such modification would allow for ***easily updating*** the health support unit of Kirk:

> Kirk and Clough each explicitly provide reasons to modify the microprocessor of Kirk to incorporate the computer programs taught in Clough to obtain a system wherein Kirk's patient stations can be easily ***updated*** for new patients to ask different questions using the simple executable computer program of Clough.

Appx990 (emphasis added); *see also* Appx989-990 ("The Requester notes that background knowledge teaches that at least one reason to modify Kirk's patient unit microprocessor to download the programs of Clough is to make it easier 'to ***alter the application program*** to add or change a feature or to remedy a problem or defect discovered in the program after the terminal is installed.'" (emphasis added)).

Bosch was thus well aware of, and had ample opportunity to respond to, the Examiner's finding that the teachings of Kirk created a design need for the techniques and programs of Clough.  This case is thus readily distinguishable from *In re NuVasive, Inc.*, 841 F.3d 966 (Fed. Cir. 2016), on which Bosch relies (Br. 33).  In *NuVasive*, noting that "the Board is not limited to citing only portions of the prior art specifically drawn to its attention," *id.* at 971, the Court found in one IPR proceeding that the patent owner ***was*** on sufficient notice of the grounds of a rejection based on a prior art figure where the petitioner referenced the text describing the figure (although not the figure itself) in its petition, *id.* at 972.  Only in a separate IPR proceeding where "there was no notice" of the basis for the rejection and "Board refused to permit [patent owner] to file a surreply or even to address the matter during oral argument," did the Court find that the Board's invalidity finding based on the figure violated the Administrative Procedure Act. *Id.* at 972-973.

In contrast, Bosch had several opportunities to respond to the thrust of the Examiner's rejection, including in its appeal brief before the Board.  Yet before the Board, Bosch ***did not even challenge*** the Examiner's determination that the exchange of information disclosed in Kirk created a design need for the techniques of Clough.  Instead, Bosch elected to raise two different challenges to the Examiner's decision—both of which it has abandoned on appeal before this Court.

Specifically, Bosch challenged the Examiner's finding on the grounds that (1) Clough teaches no preference for ***transmitting*** programs to remote computers over other methods; and (2) Kirk does not disclose central control by a central server. *See* Appx1197.  The Board considered (and rejected) both of Bosch's arguments, ultimately agreeing with the Examiner's stated rationale for combining Kirk with Clough.  Appx8-9 (rejecting Bosch's "transmission of programs" and "central server" arguments).  The Board explained:

> We ***agree with the Examiner's stated rationale*** that Kirk's information exchange between the health support unit 30 and the monitoring terminals 44 (Fig. 3) creates a design need or incentive for one of ordinary skill in the art to seek out suitable techniques, such as the distribution of program updates to remote devices mentioned in Clough, to perform these functions.  ***It does not matter that Clough does not exclusively prefer the transmission of programs over any other method of program transfer; all that is required is that Clough merely discloses such downloading to remote computers***.

Appx8 (emphases added).  Contrary to Bosch's suggestions, the Board's use of the phrase "program updates" does not reflect a deviation from the underlying rationale for the Examiner's decision, and it certainly does not transform the Board's reasoning into a new ground of rejection.  Rather, the Board simply rephrased the Examiner's prior findings in the course of "agreeing" with the Examiner's rationale, unpersuaded by the two arguments Bosch sought to raise in its appeal to the Board, and which Bosch does not press before this Court.

2.     **The Board's determination that there was a motivation to combine Kirk with Clough is supported by substantial evidence.**

Bosch next contends (Br. 31) that "[t]he record lacks any evidence" that Kirk's information exchange created a design need that is satisfied by Clough. Bosch's complaint appears again to rest solely on the Board's use of the phrase "program updates" in place of the Examiner's phrase "computer programs." *See* Br. 31 ("Petitioner … has insisted that it is the 'programs of Clough,' and not the 'distribution of program updates to remote devices,' that satisfies the alleged design needs … of Kirk."). Bosch then goes on to argue that Clough fails to disclose "the distribution of program updates" at all. Br. 32.

Bosch's arguments ignore that the Board's reference to "program updates" did not exhaust the Board's findings regarding the scope and content of Clough. Rather, in the immediately following sentence, the Board recognized that Clough disclosed "the transmission of *programs*" and, though Clough did not "prefer" such transmission of programs "over any other method of *program* transfer," Clough did "disclose[] *such downloading* [*i.e.*, transmission of programs] to remote computers." Appx8 (emphases added). That is sufficient to disclose the relevant claim limitation, given that *not a single claim* of the '327 patent requires or even suggests that the claimed system must transmit *program updates*—as opposed to "computer programs"—to the remote user. For example, claim 1

requires that the "remote user-monitoring subsystem comprises a microprocessor-based unit ***configured to receive a computer program***," and that the "central server … ***send said computer program*** to said remote user-monitoring subsystem." Appx71(21:38-50) (emphases added).  Nothing in the claims requires the central server to also send program updates to the remote user.

Indeed, there appears to be no dispute that Clough discloses the distribution of ***computer programs*** to the remote user.  As the Examiner explained, "[t]he entire stated advantage of Clough is remotely designing and transmitting computer programs to a remote system for the purpose of gathering data from individuals interacting with the remote system."  Appx991; *see also* Appx174(3:58-65) ("[The] system includes a host computer for generating the application, and a plurality of satellite computers, each advantageously being one of the portable computers described above, for executing the application received from the host computer, collecting and recording data pursuant thereto.").  Moreover, as the written description of the '327 patent itself makes clear, programming means such as those disclosed in Clough were well-known in the art.  *See* Appx70(20:55-58) ("Conventional programming and design techniques can be employed to adapt such commercially available units for the performance of the various functions and operations."); Appx71(21:16-21) ("[T]he invention can be employed with various digital networks such as recently developed interactive voice, video and data

systems [in which] … [a] user interface apparatus is interactively coupled to a remote location via coaxial or fiber optic cable or other transmission media."). Indeed, Bosch never even disputed before the Board that Clough discloses sending computer programs to the remote user. *See* Appx1196-1197.

Instead, Bosch challenged below only the Examiner's ***rationale for combining*** Kirk with Clough. *See id.* But the Board correctly rejected that argument. As the Examiner explained—an explanation with which the Board agreed (Appx8)—"one of ordinary skill in the art would recognize that Kirk's teaching of information exchange between the health support unit and the monitoring terminal creates a design need or incentive" for the program-transfer techniques disclosed in Clough. Appx1040. The Examiner further acknowledged that one reason to modify Kirk with the teachings of Clough was the ability to "***easily update[]***" the patient monitoring systems of Kirk for new patients using Clough's computer programs. Appx990 (emphasis added); *see also id.* (noting that under *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 417 (2007), a combination is obvious where it uses "known techniques to improve similar devices … in the same way"). The Examiner's findings, adopted by the Board, are more than supported by substantial evidence, including by the unrebutted declaration of Dr. Robert Stone. *See* Appx991 (relying on Dr. Stone's declaration and agreeing that "incorporating the teachings of Clough into Kirk would necessarily result in

transmitting programs from the central server to the remote system" (citing Appx930(¶12); Appx933(¶24))); *see also* Appx933((¶24) (explaining that "[t]he trend in the industry was towards … downloadable programs, which increased distribution and update speed, and reduced the cost of distribution").

Indeed, as the Examiner pointed out (Appx1040), the '327 patent itself explains that microprocessor-based self-care monitoring systems that allow "the system to be programmed by the manufacturer" were well-known in the art. Appx61(2:31-36).  It is thus eminently reasonable that a person of ordinary skill would be motivated to combine Kirk, which discloses "exchanging information" between a health support unit and a monitoring terminal (Appx197(1:64-68)), with Clough, which improves the exchange of information through the transmission of computer programs between a "host computer" and remote "satellite computers" (Appx176(7:5-9, 28-32, 46-53)).  That combination yields the alleged invention claimed in the '327 patent.  *See* Appx1040; Appx1139.

### B.    The Board Correctly Determined That Gombrich Teaches An "Authorized-User Computer."

Each claim of the '327 patent requires an "authorized-user computer … configured for two-way signal communication with, the central server to allow an authorized-user to communicate with the central server upon transmitting an identifying authorization code."  *See, e.g.*, Appx71(21:51-60).  The Board,

agreeing with the Examiner, found that Gombrich disclosed this limitation.

Appx9-10.

Bosch raises two challenges to the Board's finding on appeal. First, Bosch

once again contends that the Board's affirmance rested on a "different basis" from

that articulated by the Examiner. Br. 35. Second, Bosch claims that the Board's

finding lacks substantial evidence support because it was "based on an

unjustifiably broad reading of a single line in Gombrich." *Id.* Both arguments lack

merit.

> **1.      The Board's determination that Gombrich teaches an
> "authorized-user computer" is not a new ground of
> rejection.**

Bosch again accuses the Board of relying on a ground of rejection not

articulated by the Examiner. Br. 35. Bosch apparently takes issue with the

Board's reliance on the following sentence from the Gombrich specification: "The

remote terminals 45 might also be interconnected to a similar wand device 123 for

reading bar codes at the terminals." Appx135(12:40-43); *see* Br. 35. According to

Bosch, the Board's reliance on this passage from Gombrich was a new ground of

rejection because this *specific passage* was not cited by the Examiner. Br. 37-38.

Instead, Bosch contends that the Examiner determined that terminal 45 of

Gombrich is the claimed "authorized-user computer," but that authorization is

provided by portable RF bar code reading device 48, a device located in the patient's room rather than at terminal 45.  Br. 34; *see also* Appx103(Fig. 1).

This hair-splitting of the grounds for the Examiner's rejection is insufficient to show that a new ground of rejection arose.  "While the Board's explanation may go into more detail than the examiner's, that does not amount to a new ground of rejection."  *Adler*, 723 F.3d at 1328.  In fact, there is no question here that Bosch had a fair opportunity to address the "thrust" of the rejection.  *See In re Jung*, 637 F.3d 1356, 1365 (Fed. Cir. 2011) ("It is well-established that the Board is free to affirm an examiner's rejection so long as 'appellants have had a fair opportunity to react to the thrust of the rejection.'" (*quoting In re Kronig*, 539 F.2d 1300, 1302-1303 (C.C.P.A. 1976))).

Moreover, the reliance on a bar code reader at Gombrich's terminal 45 is not new.  In its request for *inter partes* reexamination, Cardiocom explained that Gombrich discloses an "authorized-user computer" (the healthcare professional terminal 45) that allows an authorized user to access the system by transmitting an identifying authorization code (*i.e.*, scanning the bar code on the user's badge to gain access).  Appx467-468.  The Examiner agreed, explaining as follows in the final rejection:

> Gombrich teaches at least one authorized-user computer (health care professional computer 45/258) remotely located from, and configured for two-way signal communication with (col. 9:31-38; col. 14: 30-45; col. 14: 65- col. 15: l; col. 18:43 - col. 19: 4), the central server (Fig.

1, #42; Fig. 21, #240) to allow an authorized-user to communicate with the central server upon transmitting an identifying authorization code. Gombrich, col. 16: 17-21 (stating, "When ready to administer treatment, a nurse wil[l] take the portable RF bar code reading device 48 and read her own identifying bar code badge to access the system and to identify herself."); see also Gombrich, col. 9:64 - col. 10:3.

Appx1039. In the Right of Appeal Notice, the Examiner further explained that "Gombrich … fully discloses an authorized-user computer as claimed, that allows communication with a central server upon transmitting an authorization code. It is noted that the authorized computer read[s] on the health care professional computer 45/258 of Gombrich *which has a RF bar code reading device* which allows the nurse to identify themselves and to communicate to the computer system 42." Appx1105 (emphasis added).

Both the rejection and the Right of Appeal Notice made clear that the Examiner viewed Gombrich's terminal 45 as an "authorized-user computer" and that he understood it to contain a bar code reading device that allowed access to an authorized individual—the precise basis for the Board's ruling here. Contrary to Bosch's suggestions (Br. 35), the Examiner's discussion of Gombrich's bar code reading device 48 does not undermine his finding that terminal 45 satisfies the "authorized-user computer" limitation. As both the written description and Figure 1 of Gombrich make clear, terminal 45 includes a wand device for reading bar codes "similar" to the wand device attached to bar code reading device 48. Appx135(12:30-43); *see also* Appx103(Fig. 1). The Examiner's reliance on the

passage of the specification discussing the authorization capabilities of bar code reading device 48 is therefore merely illustrative of the capabilities of the disclosed bar code readers generally.

Thus, contrary to Bosch's suggestions, Bosch was squarely placed on notice multiple times of the basis for the rejection throughout the proceedings—in Cardiocom's request for reexamination; in the Examiner's rejection; in the Right of Appeal Notice; and in just about every filing in between. Accordingly, Bosch cannot reasonably contend that it lacked an opportunity to respond to the "thrust" of the Board's rejection.

> **2.    The Board's determination that Gombrich teaches an authorized user computer is supported by substantial evidence.**

Bosch next contends that the Board's finding that Gombrich discloses an "authorized-user computer" lacks substantial evidence support because there is allegedly no disclosure "that the wand device 123 is used to scan nurse identification badges." Br. 35-36. Once again, contrary to Bosch's contentions, the Board's finding is more than supported by substantial evidence. Indeed, there appears to be no dispute that Gombrich discloses a bar code reading device that is used to allow nurses to access the system. *See* Br. 36 ("Nurse ID badges also include bar codes that are used to identify the nurse to access the system at the portable bar code reader 48 when administering medications."). Nor could there

be.  Gombrich's specification makes clear that the bar code reader will be used to read a nurse's identifying badge "to access the system and to identify herself"— *i.e.*, to allow access to an authorized user.  Appx137(16:18-21).

Bosch raises two challenges to the Board's finding that Gombrich discloses the "authorized-user computer" limitations.  Bosch first appears to argue that Gombrich fails to disclose this limitation because it does not specifically disclose that the bar code reader *located at terminal 45*—as opposed to the portable bar code reader 48—allows an authorized user to communicate with the system upon transmitting an authorization code.  Br. 36.  But Bosch wrongly seeks to dissect Gombrich's teachings to evade obviousness.  As this Court has explained, "'[a] reference must be considered for everything it *teaches* by way of technology.'" *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (quoting *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) (emphasis in original)).

Gombrich's specification teaches that the bar code reader can be used for many different purposes, including to "provide for limited access to the system and provide for identification of the person and/or department entering data respecting a patient and/or items."  Appx130(2:50-54).  One of the bar code reading devices described in Gombrich is a "portable bar code reading device 48" located in a patient's room that is "used to read the patient and item identification bar codes."

Appx134(9:64-66); *see also* Appx109(Fig. 11).  But Gombrich further explains that "a nurse will take the portable RF bar code reading device 48 and read her own identifying bar code badge to access the system and to identify herself." Appx137(16:18-21); *see also* Appx143(27:21-26); Appx149(39:39-43).

Although Gombrich describes the portable bar code reading device 48 in the patient's room in detail, it also makes clear that "there might be many other ones of the bar code reading devices 48 located throughout the hospital," even including "nonportable bar code reading devices" that are "used in some areas of the hospital where portability is not necessary or desirable."  Appx134(9:67-10:5).  In fact, Gombrich explicitly states that "remote terminals 45" (*e.g.*, a nurse's station) "might also be interconnected to a ***similar*** wand device 123 for reading bar codes at the terminals" (Appx135(12:40-43) (emphasis added)), as depicted in Figure 1 of Gombrich shown below.



FIG. I

Appx103(Fig. 1) (annotation added);[3] *see also* Appx134(9:34-38) ("The terminals

45 … might be located … in the pharmacy, in the laboratory, in the supply room,

in X-ray, in radiology, in the billing department, ***at the nurses' stations, etc.***"

(emphasis added)).

Given Gombrich's teaching that portable bar code wand 120 attached to bar

code reader 48 can be used to grant an authorized user access to the system and

that terminal 45 may be equipped with a "***similar***" bar code wand (depicted as 123

---

[3]    Although Figure 1 refers to a "Bar Code ***Ward***" connected to terminal 45
and portable bar code reader 48, that appears to be a typographical error; the
written description makes clear that that elements 120 and 123 are meant to refer to
bar code ***wands***. *See, e.g.*, Appx135(12:30-43) ("The bar code reading device 48
includes a ***wand*** device 120 interconnected by a cord 121 ….  The remote
terminals 45 might also be interconnected to a similar ***wand*** device 123 for reading
bar codes at the terminals."  (emphases added)).

in Figure 1 above) (Appx135(12:40-42) (emphasis added)), the Board correctly found that "an authorized user located at, for example, a nurses' station may authenticate his or her use of the authorized-user computer (terminal 45) using bar code reader 123, just as a nurse working in a patient's room may do" (Appx9-10 (citations omitted)).

Bosch next argues (Br. 36-37) that Gombrich fails to disclose that an authorized user is *required* to scan his or her ID badge in order to gain access to the system. That argument lacks merit too. Nothing in the '327 patent claims *requires* the authorized user to transmit an authorization code in order to access the system or receive reports. The claims merely require the "authorized-user computer" to be "configured for two-way signal communication with, the central server *to allow* an authorized-user to communicate with the central server upon transmitting an identifying authorization code and receive reports." Appx71(21:51-56) (emphasis added). Gombrich's terminal 45, equipped with the bar code reader also described in Gombrich, certainly satisfies this limitation. Indeed, as the Board explained on rehearing, the fact that Gombrich's terminal 45 does not inherently require authentication "does not lead to the conclusion that terminal 45 *cannot* authorize a user." Appx16.

Thus, the Board correctly determined that Gombrich discloses an "authorized-user computer" (*i.e.*, terminal 45) "to allow an authorized-user to

communicate with the central server upon transmitting an identifying authorization code." Appx71(21:51-55).

## II. THE BOARD CORRECTLY DETERMINED THAT CLAIMS 13 AND 51 OF THE '327 PATENT ARE OBVIOUS OVER KIRK IN VIEW OF GOMBRICH AND CLOUGH.

### A. The Board Correctly Construed The Term "User" In Accordance With Its Broadest Reasonable Interpretation.

Claim 13 of the '327 patent depends from claims 1, 2, and 7, and recites: "wherein the system is configured to enable *the user* to respond to information on the display by using a cursor or other indicator positioned at a selected item." Appx71(22:27-30) (emphasis added). Claim 51, which depends from claim 39, recites an identical limitation. Appx72(24:47-50). The Board construed the term "user" in claims 13 and 51 according to its broadest reasonable interpretation to include "either a patient … or a health care professional." Appx10; *see also* Appx17-18. In doing so, the Board explained that the claims, at various points, refer to a "remote-user monitoring subsystem," an "authorized-user computer," an "authorized user," and a "remote user being monitored" (among other user-related terms) (Appx17-18; *see also* Appx71(21:38, 51, 53, 59-60)), whereas claims 13 and 51 simply refer to "the user" without "specify[ing] the identity of the 'user'" (Appx10). Accordingly, the Board construed the term "user" in claims 13 and 51 broadly to refer to *any* user—whether patient or healthcare professional—of the "remote-user monitoring subsystem." *Id.*

- 41 -

Bosch challenges the Board's construction of the term "user" in claims 13 and 51 because it contends that the Board's construction would require the term to "have two different elements as the antecedent basis"—a "remote user" and an "authorized-user"—which "would render the term indefinite." Br. 39-40. But contrary to Bosch's suggestions (Br. 40), there is nothing indefinite about construing the word "user" according to its broadest reasonable meaning: the individual who is "using" the system, which may be a patient or a healthcare professional. Given the numerous mentions of a "user" throughout the claims— none of which appears in isolation as in claims 13 and 51—the claims are not clearly limited to the patient as Bosch proposes, but are instead broad enough to include any user of the remote-user monitoring system. And even if Bosch were correct that the term "user" required antecedent basis—though it does not and may simply be given its broadest ordinary meaning—the mere lack of clear antecedent basis for a term does not render a claim indefinite, particularly where, as here, the claim "inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014); *see also In re Skvorecz*, 580 F.3d 1262, 1269 (Fed. Cir. 2009) ("'Obviously, ... the failure to provide explicit antecedent basis for terms does not always render a claim indefinite.'" (quoting M.P.E.P. § 2173.05(e) (8th ed. 2008)) (alteration in original)). A claim term is not indefinite merely because it is broad.

Thus, the Board's construction of "user" in claims 13 and 51 of the '327 patent should be affirmed.

### B. The Board's Determination That Gombrich Discloses The Claimed "User" Is Supported By Substantial Evidence.

Bosch does not even attempt to argue that Gombrich fails to disclose the claimed "user" in claims 13 and 51 under the Board's correct construction. Nor could it; Gombrich discloses the use of "portable handheld patient terminals" which "might be located in the patient's room or other areas wherein patients are frequently present." Appx139(19:67-20:6). Gombrich further teaches that the portable handheld patient terminal is equipped with a "keypad … [that] will allow the operator to select the function desired." Appx143(27:4-7); *see also* Appx143-144(28:1-30:45) (describing the various options to be selected by the user). Accordingly, Gombrich discloses that "the system is configured to enable the user to respond to information on the display by using a cursor or other indicator positioned at a selected item." Appx71(22:27-30).

Moreover, even assuming that the "user" recited in claims 13 and 51 were limited to the patient as Bosch suggests, a patient's use of the "portable handheld patient terminals" disclosed in Gombrich is merely a trivial variation on Gombrich's teachings that has no bearing on patentability. As explained above, Gombrich's patient terminal is located in the patient's room and is used to store patient data. Appx139(19:50-20:6) (explaining that the portable patient terminal is

"used when administering drugs, taking vital signs, etc." and is "located in the patient's room or other areas wherein patients are frequently present"). Claims 13 and 51 recite a "system" configured to enable a user to respond, and that "system" is the same whether the user is an authorized user, a remote user, or any other user. *See* Appx71(22:27-30); Appx72(24:47-50); *see also* Appx117(Figs. 26-28). Thus, regardless whether Gombrich expressly discloses use of the handheld terminal by the patient (as opposed to a healthcare professional), Gombrich's disclosure describes the structure claimed. In any event, use of the terminal *by* a patient would be an obvious variant to use by a nurse *for* a patient, keeping in mind that a skilled artisan would have had a degree in Electrical Engineering or Computer Science and at least 2 years of experience with the design and programming of patient monitoring systems. Appx929(¶10). Thus, even under Bosch's overly-narrow interpretation of the claims, the only reasonable conclusion that the Board could have reached here was that claims 13 and 51 are obvious over Kirk in view of Gombrich and Clough.[4]

---

[4]    Affirmance on this basis would not violate *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), as it is "clear that 'the agency would have reached the same ultimate result' had it considered" this ground of rejection. *Fleshman v. West*, 138 F.3d 1429, 1433 (Fed. Cir. 1998); *see also In re Watts*, 354 F.3d 1362, 1370 (Fed. Cir. 2004) ("[The *Chenery*] principle does not obviate the need to consider the issue of harmless error or mechanically compel reversal 'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of the decision reached.'" (quoting *Massachusetts Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964))).

## CONCLUSION

The Board's decision should be affirmed.[5]

Respectfully submitted,

DANIEL W. MCDONALD
MERCHANT & GOULD P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN  55402
(612) 332-5300

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

*Attorneys for Appellees Cardiocom,
LLC and Medtronic, Inc.*

February 21, 2017

---

[5]    Bosch requests that this Court reverse the Board's decision and "confirm patentability of the pending claims."  Br. 41.  But the very most Bosch's appeal could produce is a remand for further proceedings before the Board.  *See, e.g.*, *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014) (remanding for further proceedings after correcting Board's claim construction).  As noted above, the Examiner determined that the '327 patent claims were invalid on twenty separate grounds, only one of which was addressed in the Board's decision.  *See supra* p. 16.  Indeed, the Board expressly noted that its affirmance of the Examiner's rejection based on the Kirk/Gombrich/Clough combination rendered it "unnecessary to reach the propriety of the Examiner's decision to reject those claims on a different basis."  Appx11.  Those nineteen additional grounds of rejection would remain open on any remand.

# CERTIFICATE OF SERVICE

I hereby certify that, on this 21st day of February, 2017 I filed the foregoing

Brief for Appellees Cardiocom, LLC and Medtronic, Inc. with the Clerk of the

United States Court of Appeals for the Federal Circuit via the CM/ECF system,

which will send notice of such filing to all registered CM/ECF users.


/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Circuit Rule 32(a).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 9,515 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

February 21, 2017